IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH PAUL HOUSE,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br><br><br>Case No. 2:10-CR-007<br><br>Judge Dee Benson |

This case is before the court on defendant Joseph Paul House's Motion to Suppress. (Dkt. No. 20.) On May 7, 2010, the court conducted the initial evidentiary hearing on the motion. On June 2, 2010, the court held a second, supplemental evidentiary hearing. At both of these hearings the defendant was present with his counsel Vanessa M. Ramos. The government was represented by Victoria K. McFarland. At the conclusion of the second evidentiary hearing, the court ordered a transcript as well as briefing from the parties. Thereafter, at defense counsel's request, the court heard oral argument on the matter on October 1, 2010. Having considered the parties' briefs, the evidence presented at both hearings on the motion to suppress,

1

and the arguments of counsel, the court enters the following memorandum decision and order.

## **BACKGROUND**

Having listened to the testimony and carefully observed all of the evidence in this case, including the demeanor of the witnesses, the court finds the relevant facts as follows.[1]  Officer Aaron Daley is a police officer with the West Jordan City Police Department.  (Tr. at 5.)  On November 20, 2009, at approximately 12:30 p.m., Officer Daley was dispatched to a neighborhood in the area of 6200 South 4800 West.  (Tr. at 6.)  Officer Daley was responding to a "suspicious activity" call, wherein a woman called the police because she heard a noise and believed someone may have been in her basement.  (Tr. at 6.)  Officer Daley was the first officer to arrive on the scene.  (Tr. at 6.)  Officer Daley watched the residence for approximately five to seven minutes while he waited for assisting officers.  (Tr. at 6.)  When additional officers arrived, Officer Daley met with the homeowner and conducted an investigation in the residence. (Tr. at 7.)  Officer Daley did not find any evidence that someone had been in the home.  (Tr. at 7.)  The investigation lasted approximately 15 minutes.  (Tr. at 23.)

After completing the investigation, Officer Daley stopped to talk to his sergeant whose vehicle was parked in a nearby cul-de-sac.  Following their conversation, the sergeant entered his marked patrol vehicle and began driving south on Barton Park Drive toward an intersection with Aspen Park Drive.  Officer Daley was walking south toward his vehicle when he noticed a

---

[1]Although the evidentiary hearing in this matter was held on two separate dates, the transcripts of these hearings are consecutively paginated.  The May 7, 2010 hearing is contained in pages 4-68 of the transcript and the June 2, 2010 hearing is contained in pages 70-96.  Reference to the transcript of these hearings will be cited as "Tr. at __."

male, later identified as the defendant, walking eastbound on Aspen Park Drive, toward the location of the earlier "suspicious activity" call. (Tr. at 8, 25, 40.) Officer Daley observed the defendant stop, turn around, and begin to walk west on Aspen Park Drive. (Tr. at 8, 30, 40.) It appeared to Officer Daley that the defendant changed his direction of travel on Aspen Park Drive when he saw the sergeant's car approaching. (Tr. at 9.) Officer Daley thought the defendant might be trying to avoid contact with the police. (Tr. at 9.) Based on this observation and the suspicious call he had just finished investigating, Officer Daley decided to make contact with the defendant. (Tr. at 3.) Officer Daley entered his marked patrol car and drove to Aspen Park Drive where he continued to observe the defendant walking westbound. (Tr. at 10.) Using the radio in his patrol car, Officer Daley "called out" to his sergeant – who had stopped his vehicle down the street to look at a "tagging incident" – and informed his sergeant that he was stopping to talk to someone in the area. (Tr. at 12.)

Officer Daley parked his patrol car facing west on Aspen Park Drive and sought to approach the defendant who was approximately 10 to 12 feet away and continuing to walk westbound. (Tr. at 11, 31.) The defendant was holding a cell phone to his right ear with his right hand and had his left hand in his left coat pocket. (Tr. at 11, 32-33.) Officer Daley approached the defendant from behind on the sidewalk and asked if he could speak with him. When the defendant did not respond, Officer Daley made a second request to talk to the defendant. Officer Daley said, "hey, can I talk to you, hey, can I ask you a few questions?" (Tr. at 31, 52.) This time, the defendant turned and faced Officer Daley but remained on his cell phone. Officer Daley told the defendant that he needed him to get off his cell phone and the defendant complied. (Tr. at 32, 37, 52) The defendant felt like he was "free to leave at that

3

point and walk away," but he did not walk away because, in his words, staying to answer the officer's questions was "the right thing to do." (Tr. at 52, 62.)

The encounter between Officer Daley and the defendant took place on the sidewalk. (Tr. at 11.) Officer Daley, who was initially the only officer present, was dressed in his police uniform and characterized the tone of the conversation as "an everyday encounter." (Tr. at 12.) Officer Daley observed the defendant to be a Hispanic male, wearing a "khaki green puffy coat and jeans." (Tr. at 11.) As the defendant turned to face Officer Daley he continued to hold his cell phone in his right hand, and he kept his left hand in his left coat pocket. (Tr. at 13, 33.) Although the defendant's coat was very large and puffy, Officer Daley observed what he believed to be a "bulge" in the area of the left coat pocket and it appeared to Officer Daley that the bulge was something more than just the defendant's left hand. (Tr. at 13, 33.)

Officer Daley asked the defendant if he had any weapons on him. (Tr. at 13.) The defendant said "no," but as he was responding Officer Daley observed the end of a black folding knife in the defendant's right coat pocket. (Tr. at 13.) Officer Daley was able to "see the knife in plain view as [he] was walking up on the [defendant]" because the pocket "was gapped" open. (Tr. at 34, 76, 84.) Officer Daley was able to immediately identify the object in the pocket as a folding knife because it was similar to something Officer Daley carries on duty. (Tr. at 13.)[2]

---

[2]Defense counsel argues that Officer Daley's testimony that he saw the knife in defendant's pocket cannot be believed. In support of this argument, defense counsel relies heavily on the in-court demonstration in which a similarly sized individual donned the defendant's green puffy coat, placed the gun in his waistband, and put the folding knife in the right coat pocket. (See Tr. at 75-90.) Having observed the in-court demonstration, and having listened to all of the testimony in this case, the court finds Officer Daley to be a credible witness. More specifically, the court finds credible Officer Daley's testimony that he saw the end of the folding knife in defendant's gaped open pocket. See United States v. Worthon, 520 F.3d 1173, 1178 (10th Cir. 2008) (determining the credibility of witnesses is a factual determination and

4

Officer Daley then asked the defendant to place his hands behind his back. While the defendant was placing his hands behind his back, Officer Daley retrieved the knife from the defendant's pocket. (Tr. at 13, 35.)

After securing the knife, and with the defendant's hands behind his back, Officer Daley conducted a "Terry frisk" of the defendant. Officer Daley did not conduct a full search of the defendant's person at that time, rather Officer Daley patted down only the areas he believed were "highly probable for weapons," beginning on the defendant's left side in the area where Officer Daley had previously perceived a bulge in the defendant's jacket. (Tr. at 14, 35.) As Officer Daley began to pat down the defendant's left side he immediately felt what he believed to be the butt of a gun. (Tr. at 14, 35.)

By this time, Officer Daley's sergeant arrived at the location. Officer Daley advised his sergeant via "police code" that he felt a gun and then Officer Daley placed the defendant in handcuffs. (Tr. at 14.) Officer Daley retrieved the gun, which was tucked into the left side of Defendant's waistband, in the area under the left coat pocket.[3] (Tr. at 14, 77, 86.) The gun was a .44 Magnum Super Blackhawk Ruger with a six-inch barrel. (Tr. at 14; Govt's Ex. 2.) As he

---

squarely within the province and discretion of the district court). As is clear from the court's analysis that follows in the body of this Memorandum Decision, the outcome of this motion rests largely on this finding of fact by the court. The court's assessment of Officer Daley's testimony regarding the knife was that the officer was straightforward and displayed an overall demeanor of candor and truth-telling. He was neither hesitant nor rehearsed. Simply put, the court believed he saw the knife in the right pocket of the defendant's coat before he performed a pat-down search of the defendant.

[3]Although Officer Daley originally testified generally that he retrieved the gun "on the inside of the left coat pocket," (Tr. at 14), he later clarified that he did not mean to suggest that the gun was located "inside the pocket," but rather explained that the gun was located on the inside of or under the coat, in the defendant's waistband, in the area of the left coat pocket. (Tr. at 77, 85-86.)

5

retrieved the gun, Officer Daley noticed that the serial number had been "obliterated" and was filed down. (Tr. at 15.) Officer Daley handed the gun to his sergeant and then conducted a full search of the defendant incident to his arrest. (Tr. at 15.)

As a result of these events, the defendant was charged in a one-count indictment with being a felon in possession of a firearm. (Dkt. No. 1.) Thereafter, the defendant moved to suppress the evidence in this case on the grounds that Officer Daley's conduct violated his Fourth Amendment rights. (Dkt. No. 20, Def.'s Mot. To Suppress.)

## DISCUSSION

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures by government actors. See U.S. Const. Amend. IV; United States v. Sanchez, 89 F.3d 715, 717 (10th Cir. 1996). In this case, the defendant claims that Officer Daley violated his Fourth Amendment rights by (1) unlawfully detaining him on the sidewalk and (2) by conducting an unlawful search of his person. (Def.'s Mem. In Supp. at 7, 11.) The court addresses each of these items in turn.

**I. The Encounter Between Officer Daley and Defendant**

The defendant argues that he was "seized" by police when Office Daley, dressed in his police uniform, followed the defendant down the sidewalk, asked the defendant if he could talk to him, and then told the defendant to get off his cell phone. The defendant argues that because this seizure was not supported by reasonable suspicion of criminal activity it was in violation of the Fourth Amendment.

The Supreme Court, however, has held that not all encounters with law enforcement

implicate the Fourth Amendment. In Florida v. Bostick, 501 U.S. 429 (1991), the Court expressly provided that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Id. at 434. The Court explained: "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Id.; see also Florida v. Royer, 460 U.S. 491, 497 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen."). The crucial test is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Bostick, 501 U.S. at 437.

The United States Court of Appeals for the Tenth Circuit has identified several factors that are relevant to the Bostick totality-of-the-circumstances approach. These include, but are not limited to:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or small, enclosed place; and absence of other members of the public.

United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003) (citing United States v. Hill, 199 F.3d 1143, 1147-48 (10th Cir. 1999)). The Tenth Circuit has also made clear that "no single factor can dictate whether a seizure occurred." Hill, 199 F.3d at 1148. Considering the facts of this case in light of these legal principles, the court concludes that the interaction between the defendant and Officer Daley amounted to a consensual encounter that did not implicate the

7

Fourth Amendment.

The interaction between Officer Daley and the defendant was brief, lasting at most only a few minutes. The encounter occurred in a public setting as Officer Daley approached the defendant on a public sidewalk, during the middle of the day, in full view of anyone who happened to be passing by. Although Officer Daley was in uniform and armed, he was the only officer present and he never touched or brandished his weapon during the encounter. Officer Daley approached the defendant from behind and did not, at any time, step in front of the defendant, block the defendant's path, physically restrain, or prevent the defendant from continuing along the sidewalk.

Although defense counsel argues that Officer Daley made a "show of force" by issuing commands at the defendant, the evidence presented at the hearing does not support this conclusion. In fact, the defendant's own testimony demonstrates that Officer Daley's request to speak with him was presented in a non-intrusive, non-aggressive manner. For example, when defense counsel asked the defendant, "Did you feel like you were free to leave at that point and walk away?" the defendant responded, "Well, sure, but I ain't going to walk away from an officer trying to ask me questions." (Tr. at 52.) Similarly, when defense counsel attempted to clarify the officer's alleged "commands" by stating: "So [the officer] asked you to get off the phone? Or he's making some indication you need to get off the phone?" The defendant responded, "No. He says, can I ask you a few questions. I told him, hold on, because I was talking to somebody at that point." (Tr. at 52.) There is simply no evidence that Officer Daley used a commanding or threatening manner or tone of voice. Finally, the consensual nature of the encounter is not undermined by Officer Daley's failure to expressly tell the defendant he was

8

free to leave.  See INS v. Delgado, 466 U.S. 210, 216 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."); see also United States v. Broomfield, 201 F.3d 1270, 1275 (10th Cir. 2000) ("[T]here is nothing unlawful about the practice of approaching individuals and asking them potentially incriminating questions, and there is no per se rule requiring law enforcement officials to specifically advise those individuals they do not have to answer police questions.").

In sum, the court finds that the encounter between Officer Daley and the defendant, viewed in its totality, falls within the parameters of a consensual encounter as set forth in Supreme Court precedent and prior Tenth Circuit decisions.  Considering all of the facts in this case, Officer Daley's conduct would not have conveyed to a reasonable person that "he was not free to decline the officers' requests or otherwise terminate the encounter."  Bostick, 501 U.S. at 439.  Therefore, because the encounter was consensual, it was not a seizure within the meaning of the Fourth Amendment.

**II.     Officer Daley's Pat-Down Search of the Defendant**

Next, the defendant claims that Officer Daley conducted a pat-down search of the defendant without lawful justification.  In Terry v. Ohio, 392 U.S. 1 (1968), the Court explained that a pat-down search for weapons is justified by the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."  Id. at 23.  The Court reasoned that "[c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."  Id.; see also United States v. Melendez-Garcia, 28 F.3d 1046,

9

1051 (10th Cir. 1994) (police officers may take reasonable steps necessary to protect their personal safety).

Applying the principles set forth in Terry, the Tenth Circuit has stated that "an officer may pat-down a suspect if the facts available to the officer 'would warrant a man of reasonable caution to believe that a frisk would be necessary to protect himself.'" United States v. Manjarrez, 348 F.3d 881, 886 (10th Cir. 2003) (quoting United States v. McRae, 81 F.3d 1528, 1536 (10th Cir. 1996)); see also Hishaw, 235 F.3d at 570 (providing officer may conduct pat-down search if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous). The purpose of the limited pat-down search is not to discover evidence of a crime, "but to allow the officer to pursue his investigation without fear of violence." Adams v. Williams, 407 U.S. 143, 146 (1972). The reasonable suspicion required to justify a pat-down search represents a "minimum level of objective justification." United States v. Rice, 483 F.3d 1079, (10th Cir. 2007) (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)). It is based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense. Rice, 483 F.3d at 1083.

In this case, the court has no trouble concluding that the facts presented to Officer Daley warranted a pat-down search of the defendant. To begin, the court notes that at the time of the incident, Officer Daley had been a police officer for 7 years and had prior experience with the Metro Gang Unit which provided him with special training in the identification of armed persons. (Tr. at 5-6.) On the day in question, Officer Daley had been called to the area because a resident believed that an intruder might have been in her basement. Although Officer Daley was unable to substantiate that anyone had been in the home, Officer Daley's sole purpose for

being in the neighborhood was to investigate possible criminal activity. Thereafter, and within a relatively short time following the investigation, Officer Daley noticed the defendant walking in the general vicinity of the home, and Officer Daley also noted that defendant was the only person he had seen in the area at the time. (Tr. at 40-41.) Additionally, Officer Daley observed the defendant change his direction of travel upon noticing the sergeant's marked patrol car driving toward him down the street, and this caused Officer Daley to wonder if the defendant was trying to avoid contact with the police. (Tr. at 9.)

After deciding to make contact with the defendant on the sidewalk, Officer Daley observed the defendant to be wearing a large, puffy coat with a "bulge" in the general location of defendant's left coat pocket, and the bulge appeared to Officer Daley to be more than simply the defendant's left hand. Most significant, however, is the fact that immediately after Officer Daley asked the defendant if he had any weapons, as the defendant was verbally responding that he did not, Officer Daley personally observed the end of a folding knife in the defendant's gaped open pocket. Given the defendant's response that he had no weapons, which was inconsistent with the fact that Officer Daley had just observed a knife in the defendant's pocket, Officer Daley did a pat-down search for safety purposes.

Considering the totality of the circumstances in this case, especially when viewed from the vantage point of those versed in the field of law enforcement, the court finds there was a sufficient basis to justify Officer Daley's minimally intrusive pat-down search of the defendant based on reasonable officer safety concerns. Accordingly, the court concludes that the pat-down search was lawful and did not violate the Fourth Amendment.

## **CONCLUSION**

Having determined that the encounter between the defendant and Officer Daley was consensual, and having further determined that the pat-down search of the defendant was justified, based on officer safety concerns, the defendant's Motion to Suppress is DENIED.

Dated this 18th day of October, 2010.

_____
Dee Benson
United States District Court Judge